# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Kellee Rae Cogger, | Civ. No. 15-4291(ADM/BRT) |
| Plaintiff, | |
| v. | |
| Carolyn W. Colvin,<br>Acting Commissioner of<br>Social Security, | **REPORT AND<br>RECOMMENDATION** |
| Defendant. | |

---

Carol L. Lewis, Esq., counsel for Plaintiff.

Pamela A. Marentette, Esq., Assistant United States Attorney, counsel for Defendant.

---

BECKY R. THORSON, United States Magistrate Judge.

Pursuant to 42 U.S.C. § 405(g), Plaintiff Kellee Rae Cogger seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner") denying her applications for disability insurance benefits and supplemental security income. This matter is currently before this Court on the parties' cross-motions for summary judgment. (Doc. Nos. 15, 20.) This matter has been referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and D. Minn. LR 72.1(a)(3)(D). For the reasons stated below, this Court recommends that Plaintiff's motion be denied and Defendant's motion be granted.

# BACKGROUND

## I.   Procedural History

Plaintiff filed applications for Title II disability insurance benefits and Title XVI supplemental security income on June 21, 2012. (Tr. 13, 193–99, 202–05.)[1] The Social Security Administration ("SSA") denied Plaintiff's applications on October 9, 2012, and again on reconsideration on February 19, 2013. (Tr. 13, 128–30, 134–36.) At Plaintiff's request, a hearing was held before an Administrative Law Judge ("ALJ"), C. Howard Prinsloo, on January 9, 2014. (Tr. 13, 38.) The ALJ denied Plaintiff's applications on January 27, 2014, and the Social Security Appeals Council denied her request for review on May 6, 2015. (Tr. 10–30, 5–7.) The denial of review by the Appeals Council made the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. § 404.981.

Plaintiff filed this action on December 4, 2015, seeking judicial review under 42 U.S.C. § 405(g). (Doc. No. 1, Compl.) The parties thereafter filed cross-motions for summary judgment. (Doc. Nos. 15, 20.) In her motion, Plaintiff alleges two errors by the ALJ. (Doc. No. 16, Pl.'s Mem. 8–9, 11, 16–17.) First, Plaintiff argues that the ALJ's finding at step three that her impairments are not medically equivalent to the severity of a listed impairment is not supported by substantial evidence. (*Id.* at 8–9, 11.) Second, Plaintiff argues that the ALJ's finding on residual functional capacity ("RFC") is not supported by substantial evidence because it did not include findings by a treating provider on the Global Assessment of Functioning (GAF) scale. (*Id.* at 14–17.) Plaintiff

---

[1]   Throughout this Report and Recommendation, the abbreviation "Tr." is used to reference the Administrative Record (Doc. No. 11).

requests remand for further proceedings to develop the record and determine if the Commissioner can meet his burden of proof on whether there is other work that Plaintiff can perform. (*Id.* at 17.)

## II.   Factual Background

Born on March 16, 1962, Plaintiff was fifty years old[2] on her alleged disability onset date of June 20, 2012. (Tr. 29, 193, 202.) Plaintiff completed high school and two years of college, earning an associate's degree in Medical Assisting in 1982. (Tr. 39, 244.) From 1984 to 2004, she worked for CentraCare, first as an executive assistant and then as a medical transcriptionist. (Tr. 47.) After leaving CentraCare, Plaintiff worked as a medical receptionist and a special education paraprofessional. (Tr. 47–48, 244, 290.) Her last job was a full-time human resources receptionist and assistant for an organization providing foster care homes for the developmentally disabled. (Tr. 47–48, 244, 290.) Plaintiff was terminated from this job in June 2012 due to multiple absences. (Tr. 41.) Plaintiff is divorced with two adult children, a son and a daughter. (Tr. 615, 640, 698.)

### A.  Medical History

In this appeal, Plaintiff alleges that she is disabled due to chronic migraines, depression and anxiety, low back pain, and rheumatoid arthritis. (Pl.'s Mem. 2–3; Tr. 243, 301.)

---

[2]    Defined as a person "closely approaching advanced age." 20 CFR § 404.1563(d).

### i.  Migraine Headaches

#### a.  Treatment Before June 20, 2012, Plaintiff's Alleged Onset Date

Prior to her alleged onset date, Plaintiff received treatment from a variety of providers for her migraine headaches.

At an eye exam on January 19, 2011, Plaintiff reported migraine headaches triggered by bright light. (Tr. 326.) She was having floaters and flashes with her migraines, and the migraines were precipitated by visual aura for twenty to thirty minutes. (*Id.*) Plaintiff was taking Maxalt for her migraines. (*Id.*) Plaintiff was working an average of eight hours per day on a computer and enjoyed sewing and exercising. (*Id.*) In March 2011, Plaintiff had an eye exam for glaucoma. (Tr. 324.) She reported no changes since her last visit and no visual floaters or light flashes, and she was not experiencing routine headaches. (*Id.*)

Four months later, on July 21, 2011, Plaintiff presented to CentraCare complaining of a headache lasting two days, facial numbness, and word finding difficulty. (Tr. 424.) She reported that her usual home medications were helpful, but the headache did not resolve. (Tr. 423–25.) A July 22 MRI was normal. (Tr. 422, 359, 380.) On July 24, Plaintiff called CentraCare and reported that her headache returned; Plaintiff's primary care provider, Dr. Heather Neuman, recommended Plaintiff go to the emergency room, but there is no record of such a visit. (*See* Tr. 422.) On July 29, Plaintiff saw her neurologist, Dr. James Romanowsky, who increased her Topamax dosage and recommended an echocardiogram to detect patent foramen ovale. (Tr. 359–60.) At a

4

follow-up on September 12, 2011, Dr. Romanowsky reported that the echocardiogram was negative for patent foramen ovale. (Tr. 358.) Plaintiff reported that her headaches were less frequent with Topamax, but when she increased her dose, she felt "foggy at work and felt as if she would be prone to making mistakes." (*Id.*) She further reported that she continued to get severe headaches about twice a week, but they generally responded to a combination of Maxalt and Fioricet. (*Id.*) Dr. Romanowsky and Plaintiff discussed other migraine prophylaxes, including Depakote. (*Id.*) Dr. Romanowsky recommended amitriptyline in hopes of Plaintiff being able to taper off the Celexa and possibly the Topamax. (*Id.*)

On October 2, 2011, Plaintiff sought treatment for a headache at St. Cloud Medical Group. (Tr. 336.) She reported that her headache was triggered by bright light from moving into a new office, but she denied any additional symptoms occurring in association with the headache. (*Id.*) She was prescribed Vicodin. (Tr. 338.)

From December 2011 to April 2012, Plaintiff visited St. Cloud Medical Group four more times for headaches, some with and some without other symptoms such as nausea, photophobia, and phonophobia. (Tr. 339–52.) At the first visit, Plaintiff was treated with Phenergan and Nubain, and she received a prescription for hydrocodone-acetaminophen. (Tr. 341.) In the latter three visits, Plaintiff received prescriptions for hydrocodone-acetaminophen, but not Phenergan and Nubain. (Tr. 346, 349, 352.) On her second-to-last visit, Plaintiff was instructed to follow up with her neurologist as planned. (Tr. 349.)

Plaintiff went to CentraCare Clinic on May 14, 2012, for Botox injections to treat her headaches. (Tr. 356.) On June 7, 2012, Plaintiff went to the St. Cloud Hospital's emergency trauma center for treatment of a migraine headache. (Tr. 370.) Plaintiff reported suffering migraine headaches since her teens. (*Id.*) She was on "multiple medications preventively and finally found a regimen that works fairly well." (*Id.*) Plaintiff stated that she was normally able to control her migraines at home, or she went to the clinic for an injection of Nubain and Phenergan. (*Id.*) The physician noted that Plaintiff last sought emergency treatment for migraines a year ago, and Plaintiff thought stress exacerbated her current headache. (Tr. 370–71.) Plaintiff did not receive Nubain due to a national shortage; instead, she was given Dilaudid and Phenergan. (Tr. 371.) Plaintiff's results with this treatment were excellent and she requested discharge. (*Id.*)

### b.  Treatment After June 20, 2012

After her alleged onset date, Plaintiff received treatment for her migraine headaches during emergency room visits, and also in clinical settings.

On July 5, 2012, Plaintiff visited the emergency trauma center for evaluation of a headache with no associated symptoms. (Tr. 374.) She was treated with Dilaudid and Phenergan. (Tr. 375.) On August 11, 2012, Plaintiff went to the emergency room for treatment of headaches and was discharged two and a half hours later after receiving Dilaudid and Phenergan. (Tr. 450–51.)

On September 17, 2012, Plaintiff went to the emergency trauma center for treatment of a headache. (Tr. 453.) She was treated with Benadryl, Vicodin, Reglan, and discharged two hours later. (Tr. 453–54.)

On October 12, 2012, Plaintiff went to the emergency trauma center, complaining of a migraine. (Tr. 456.) She reported being under a lot of stress and anxiety and was out of Xanax, which she thought triggered her migraine. (*Id.*) She was given Benadryl, Reglan, Ativan, and, at her request, Dilaudid, and was discharged two hours later. (Tr. 457.)

Plaintiff returned to the emergency trauma center on November 8, 2012 complaining of a typical migraine headache. (Tr. 458.) She requested Dilaudid but was denied because the treating physician wanted to treat her without narcotics. (Tr. 459.) She did receive Toradol and Ativan at her request, as well as Zofran. (*Id.*)

Plaintiff visited the emergency trauma center with migraines on February 7, May 29, and May 31, 2013. (Tr. 689–96.) She was treated with Dilaudid and Phenergan at her own request on each of these three occasions, as well as with Ativan on the second. (Tr. 690, 693, 696.) On June 4, 2013, Plaintiff presented at the emergency room with her typical migraine and again requested Dilaudid. (Tr. 697.) As the treating physician did not know whether Plaintiff received Dilaudid in her last two visits for headaches, he recommended, and Plaintiff received, Reglan, Benadryl, Toradol and Decadron. (Tr. 698.) The physician noted that Plaintiff became angry after ten minutes of these medications and demanded to leave immediately because she did not receive Dilaudid. (*Id.*) She was given Dilaudid and discharged. (*Id.*)

On June 17, 2013, Plaintiff visited the emergency room and was treated with Dilaudid and fluids, although she also requested Phenergan. (Tr. 701.) During a subsequent emergency room visit on July 16, Plaintiff reported that Dilaudid and Zofran

worked well for her headaches in past, and she was treated with those. (Tr. 702–04.) On August 19, 2013, Plaintiff treated at the emergency room with Dilaudid, Toradol, Compazine, and Benadryl. (Tr. 709.) Finally, on October 1, 2013, Plaintiff visited the emergency room for "her usual cocktails of Dilaudid and Zofran." (Tr. 712.)

As for clinical treatment, on July 9, 2012, Plaintiff reported to Dr. Neuman that her migraines increased since her dose of amitriptyline was increased. (Tr. 444.) On September 4, 2012, Plaintiff reported having a migraine that morning to Dr. Mark Erickson. (*Id.*) Plaintiff took Maxalt and Fioricet with no improvement, and then ibuprofen and Xanax, which took the edge off. (*Id.*) She also reported that her headaches increased in frequency to seven or eight per month over the last several months. (*Id.*) Dr. Erickson prescribed Vicodin and urged Plaintiff to see Dr. Romanowsky or Dr. Neuman. (Tr. 442–43.)

Plaintiff treated with Dr. Romanowsky, in particular, on several occasions. On September 17, 2012, for example, Dr. Romanowsky administered Plaintiff's second Botox injection. (Tr. 480.) She reported having a bad headache two or three days after her first injection in May 2012, but overall she benefited from the injection. (*Id.*) She stated that "although the frequency of the headaches has not really decreased much, the intensity has and the responsiveness to medications . . . has improved to the point that she has not needed to go in to the emergency room for treatment of her migraines as often as before the Botox injection." (*Id.*)

On September 25, 2012, Plaintiff visited with Dr. Patricia Nee in internal medicine, where they discussed Plaintiff's depression, anxiety, rheumatoid arthritis, and

migraines. (Tr. 382, 509–10.) Plaintiff told Dr. Nee that she would like to consider

retrying Topamax for migraine prevention and discuss that with Dr. Romanowsky, but

Dr. Romanowsky told her that he wanted her to try Botox first. (Tr. 510). Plaintiff noted

no change in her headaches and said she experienced at least seven to eight of them per

month. (*Id*.)

       In a follow-up visit with Dr. Romanowsky on October 1, 2012, Plaintiff reported

having a migraine the day after her recent Botox injection, but since then she was doing

better. (Tr. 481–82.) Plaintiff had an aura recently without the headache. (Tr. 482.)

       Plaintiff saw Dr. Romanowsky on December 31, 2012 and received another Botox

injection. (Tr. 478.) She reported that her headaches decreased in severity since getting

the Botox injections, and she stopped Topamax because of dizziness. (*Id*.) Dr.

Romanowsky recommended Plaintiff continue to use propranolol and Maxalt. (Tr. 479.)

       On August 5, 2013, Dr. Romanowsky noted that Plaintiff canceled her last few

Botox injections and her emergency room visits increased since stopping them. (Tr. 717.)

Dr. Romanowsky emphasized to Plaintiff "the importance of keeping her appointments

for the Botox or if she does need to cancel and reschedule, to do it ahead of time rather

than on the day of the injection," and he opined that "if she can commit herself to

showing up and keeping her appointments for the Botox injections on a regular basis,

[they] may be able to make some progress." (Tr. 718.) Dr. Romanowsky then

recommended Depakote for migraine treatment but informed Plaintiff that Depakote can

have side effects, including weight gain. (*Id*.) After noting Plaintiff was not "enthused"

about trying Depakote because she already had a problem with weight gain due another

9

medication, Dr. Romanowsky advised Plaintiff that "Depakote sometimes is also used as a mood stabilizing medication and by psychiatry and if her psychiatrist was interested in trying the Depakote, perhaps some of her other medications could be reduced." (*Id.*)

Plaintiff returned to Dr. Nee on August 22, 2013 to discuss migraine treatment. (Tr. 572.) Dr. Nee told Plaintiff that the gabapentin she was taking for anxiety was not an ideal medication for migraine prophylaxis and recommended trying Depakote, noting that Dr. Romanowsky previously reviewed this option with Plaintiff. (*Id.*) Dr. Nee advised her to weigh the risks and benefits, specifically weight gain and reducing migraine frequency, which would reduce the need for emergency room visits. (Tr. 572–73.) Plaintiff was willing to try Depakote and was going to speak with her psychologist, Dr. Elizabeth Sikes, about switching from gabapentin to Depakote. (Tr. 573.) Dr. Sikes concluded that at that time, she saw no role for Depakote in the management of Plaintiff's psychiatric illnesses, but if neurology thought Depakote would be beneficial for Plaintiff's migraines in the future, she would recommend not having Plaintiff on both the gabapentin and Depakote. (Tr. 678.) Plaintiff stated she would discuss this conclusion with Dr. Romanowsky. (*Id.*)

On September 12, 2013, Plaintiff returned to Dr. Romanowsky for Botox injections and reported that Dr. Sikes did not think that Depakote had a place in her treatment; Dr. Sikes recommended increasing Plaintiff's gabapentin. (Tr. 713–14.) Plaintiff was having fifteen headache days per month and noticed more trips to the emergency room after discontinuing Botox. (Tr. 713.) Dr. Romanowsky advised Plaintiff

to increase her gabapentin as suggested by Dr. Sikes, and if the Botox was again helpful, to consider another injection in about three months. (Tr. 714.)

Finally, Dr. Nee noted during a visit on October 31, 2013 that Plaintiff said "the Botox provide[d] some subtle improvement," but she was still having headaches. (Tr. 586.) Plaintiff reported that "she really want[ed] to try Depakote, but . . . Dr. Romanowsky does not prescribe that." (*Id.*) As noted by Dr. Nee, Dr. Sikes mentioned that "she would not necessarily have [Plaintiff] stay on both the gabapentin and Depakote, but would prefer [Plaintiff] choosing one or the other;" Dr. Sikes reviewed this information with Plaintiff. (*Id.*) Plaintiff also reported that she requested a second opinion with another provider in the neurology clinic "but was informed that would be doctor shopping." (*Id.*) Dr. Nee noted she would be happy to place a referral for another neurology provider. (*Id.*)

### ii.  Depression and Anxiety

### a.  Treatment Before June 20, 2012

Prior to her alleged onset date, Plaintiff's depression was noted and treated by Dr. Romanowsky and Dr. Neuman. Plaintiff also treated with Dr. Ryan Engdahl, a psychologist, on reference from Dr. Neuman. (Tr. 436.)

On July 29, 2011, Dr. Romanowsky noted Plaintiff's history of depression, which Plaintiff felt was "well controlled with the Celexa." (Tr. 360.) Because depression could be worsened by Topamax, on September 12, 2011, Dr. Romanowsky recommended amitriptyline for migraine prophylaxis, hoping that Plaintiff could be tapered off Celexa and possibly Topamax as well. (Tr. 358.) In late September, 2011, Plaintiff tried

decreasing her dosage of Citalopram, as recommended by Dr. Neuman, but on October 31, 2011, Plaintiff reported that this was "not . . . working out," and "she [found] herself crying easily, and not feeling good." (Tr. 421.)

Plaintiff saw Dr. Neuman on February 24, 2012, reporting that "things had not been going well for her;" her anxiety and depression increased since reducing the Citalopram, she felt overwhelmed, and she had panic type symptoms every one to two weeks. (Tr. 417.) Dr. Neuman planned to wean Plaintiff off Citalopram and start her on Effexor. (Tr. 420.) Dr. Neuman suggested that Plaintiff participate in a program designed to improve depression called the Diamond Program. (*Id.*) During a series of Diamond visits from March to early May 2012, Plaintiff reported being stressed about possibly losing her job, separating from her eight-year boyfriend, and relationships with her co-workers. (Tr. 414, 398, 401.) She also reported feeling guilty about not having many friends and isolating herself from her family. (Tr. 405.)

Plaintiff started treatment with Dr. Engdahl on April 23, 2012. (Tr. 436.) Plaintiff reported that since tapering off of Celexa in February 2012, she experienced panic attacks about once a week; the attacks tended to peak within about five minutes, then Plaintiff would "slowly come[] back to baseline." (*Id.*) Although Plaintiff said she could "modify her breathing and at some point begin to walk to help herself come out of the episode," she began to limit going out for fear of having an attack. (*Id.*) Dr. Engdahl noted that Plaintiff was never hospitalized in a mental health unit or participated in individual therapy. (*Id.*) She also denied an event or symptoms consistent with PTSD. (*Id.*) She avoided leaving her apartment because she was fearful she might see her ex-boyfriend in

public, who was emotionally abusive. (*Id.*) After some initial difficulty identifying her strengths, Plaintiff said that she was "good at her job and a good worker," and "she [was] good at dealing with people and . . . was voted as the most fun HR worker at her place of work." (Tr. 438.) On May 11, 2012, Plaintiff reported to Dr. Engdahl that she continued to experience symptoms of anxiety, but benefited from and planned to follow through with the relaxation exercises she was taught during the session. (Tr. 434.)

On May 31, 2012, at a follow-up appointment for treatment of depression and anxiety, Plaintiff reported to Dr. Neuman that "things [were] improving significantly but she [was] still having more symptoms than she should." (Tr. 389.) She was tolerating Cymbalta well and reduced her Xanax use. (*Id.*) Her stress at work also improved. (*Id.*) At a June 7, 2012 visit with Dr. Engdahl, Plaintiff's mood was "overwhelmed," and her progress was "mild." (Tr. 433.)

### b.  Treatment After June 20, 2012

After her alleged onset date, Plaintiff treated her depression primarily with Dr. Sikes and Dr. Engdahl. Plaintiff also discussed her symptoms with Dr. Neuman and Dr. Romanowsky, and was admitted to a partial hospitalization program under the care of Dr. Terri Gerdes, a psychiatrist. (Tr. 593–94.)

In a visit to Dr. Engdahl on June 28, 2012, Plaintiff's mood was "ok" and her progress was "moderate." (Tr. 431–32.) In July 2012, Plaintiff reported to Dr. Neuman that her anxiety was worse since an increase of amitriptyline. (Tr. 381.) Dr. Neuman decreased Plaintiff's amitriptyline dose and increased her Cymbalta. (Tr. 382.) On August 23, 2012, Plaintiff told Dr. Neuman that things were "continuing to improve for

her but she [was] still needing the Xanax twice daily." (Tr. 443.) Plaintiff's mood

appeared anxious but improving. (Tr. 444.) On October 1, 2012, Plaintiff reported to

Dr. Romanowsky that she felt her depression was "currently fairly well controlled."

(Tr. 482.)

On October 10, 2012, about three months after their last session, Plaintiff returned

to Dr. Engdahl. (Tr. 590.) Plaintiff noted changes in her psychotropic medications, which

eliminated some side effects. (*Id.*) She discussed the importance of her relationships with

her children and her plans to reconnect with her mother after eight years. (*Id.*) The next

day, Plaintiff called Dr. Engdahl and said she was experiencing significant anxiety over

the last twenty-four hours. (Tr. 592.)  Dr. Engdahl recommended the Adult Partial

Hospitalization program to Plaintiff. (*Id.*)

Plaintiff was admitted to the program on October 16, 2012. (Tr. 596.) In her first

psychiatric consultation, Dr. Gerdes observed that Plaintiff's recent exacerbation of

anxiety might be related to medication changes, so she recommended that Plaintiff try

Remeron, reduce Cymbalta, and transition from Xanax to Ativan. (Tr. 596–97.) On

October 18, Dr. Sikes noted that Plaintiff's mood was much better, and Plaintiff was

"reactive and bright." (Tr. 599.) Plaintiff stated that the switch to Ativan was very

helpful, and she was willing to continue her current medications because she felt much

better, she was no longer nauseous, and her appetite improved. (Tr. 598–99.) On October

22, Plaintiff reported an improved mood to Dr. Gerdes, describing "a night and day

difference" since a week prior. (Tr. 600–01.) On October 25, Dr. Gerdes noted that

Plaintiff was depressed due to "significant situational stressors," including possible

eviction from her home and her ex-boyfriend banging on her doors and windows the previous night. (Tr. 603.)

On October 29, 2012, Plaintiff reported to Clinical Nurse Specialist Brandon Smith that her mood was "quite tearful" after seeing a Facebook post in which her daughter referred to her stepmother as her mother. (Tr. 605.) On November 1, Plaintiff told Nurse Smith that her mood was better, and she continued to exercise daily and felt it was an important part of her physical and mental health. (Tr. 609.) Plaintiff also indicated that her mood was worse in winter, so Nurse Smith suggested a light box treatment. (*Id.*) On November 6, Plaintiff reported that the light box treatment was helpful and her energy level improved, but she was worried about moving out of her apartment to live with her daughter. (Tr. 611.) Nurse Smith recommended that Plaintiff begin taking Lexapro and stop taking Cymbalta. (Tr. 612.) On November 12, Plaintiff told Nurse Smith that "she was sleeping more affectively [sic];" she also thought Remeron was "a godsend." (Tr. 614.) Plaintiff's children joined her for a session; Plaintiff said she wanted to continue building relationships with them. (Tr. 615.) Plaintiff felt that she benefited from the partial hospitalization program because she was sleeping better, her mood was more stable, and she could better manage stressors. (*Id.*) Nurse Smith observed, "[f]or the most part, she seemed to be doing quite well." (*Id.*) Plaintiff's GAF[3] improved from 45 at the

---

[3]    The Global Assessment of Functioning (GAF) Scale is used to report "the clinician's judgment of the individual's overall level of functioning." Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. Text Revision 2000). GAF scores of 41 to 50 reflect "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school

(Footnote Continued on Next Page)

time of admission to 65 at the time of discharge from the Partial Hospitalization program. (Tr. 615–16.)

Plaintiff saw Dr. Engdahl twice in November; he noted that Plaintiff's mood was good and she was busy moving out of her apartment, though she was concerned about living with her son and daughter. (Tr. 617, 619.) Plaintiff said that the Partial Hospitalization program was a "very positive experience." (Tr. 617.)

On December 10, 2012, Plaintiff reported to Dr. Sikes that she "really decompensated" since moving in with her daughter. (Tr. 621.) Due to the chaos in the house and the many young people there, Plaintiff once considered attempting suicide. (*Id.*) Plaintiff also gained weight from Remeron. (*Id.*) Her clothes were tight as a result, and she was sad because she could not afford to buy new clothes or Christmas presents. (*Id.*) Dr. Sikes recommended decreasing Plaintiff's Remeron while increasing Lexapro. (Tr. 622–23.) Plaintiff returned to Dr. Engdahl on December 12 and 17 with an "OK" mood and discussed her relationship with her mother and her tendency to isolate at her daughter's home. (Tr. 624, 626.) She was no longer feeling suicidal. (Tr. 624.)

---

(Footnote Continued from Previous Page)
functioning (e.g., no friends, unable to keep a job)." *Id.* at 34. GAF scores of 51–60 indicate "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.* GAF scores of 61–70 indicate "[s]ome mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.*

During a December 27, 2012, consultation with Dr. Engdahl, Plaintiff reported that the Lexapro increase seemed to help, her mood was improved, and she felt "at times [like she] could actually smile." (Tr. 628.) Dr. Engdahl observed that Plaintiff was briefly tearful, yet "quite a bit brighter," and smiled repeatedly. (*Id.*) Plaintiff also reported that she was sleeping better and felt "hopeful that things will get better." (*Id.*) On December 31, she reported that her relationship with her brother was important to her, regretting that she was not more involved in his life. (Tr. 630.) She also indicated that she was planning to contact friends about getting together "in an effort to create some excitement and anticipation for herself." (*Id.*)

Plaintiff reported to Dr. Engdahl on January 8, 2013 that she was doing well despite an incident of dizziness that she believed was due to her medication regimen. (Tr. 633.) She said her mood was good with fewer distressing nightmares and no significant anxiety or flashbacks. (*Id.*) On January 17, Plaintiff continued to report feeling better, including working out twice a day doing aerobics. (Tr. 634.) Her headaches were also improved, and she could sleep through the night without recalling any nightmares. (*Id.*) Dr. Engdahl noted that "overall things seem improved" and that Plaintiff was "bright and reactive and appropriate." (Tr. 634–35.)

On February 19, 2013, Dr. Engdahl again noted that Plaintiff's mood was good and her affect was "bright and reactive." (Tr. 641.) Plaintiff continued to feel better, and her mood was generally improved. (Tr. 640.) She stated she was "reaching out to her family and [was] talking to people she [had] not spoken with for over a year;" her family was being warm and supportive, and she hoped to visit them in the coming weeks. (*Id.*)

She described receiving an upsetting text from her ex-husband and being able to calm herself down. (*Id.*) She also reported trying to wean off Remeron, but she was still taking it at bedtime because it helped with sleep and nightmares. (*Id.*) Plaintiff was taking Lexapro at lunch and felt "more clear-headed." (*Id.*) She was walking daily and getting out in the light, which she felt was helpful (*Id.*)

Plaintiff consulted with Dr. Engdahl three times from February 26 to April 3, 2013. (Tr. 642, 645, 647.) During these consultations, her mood was "OK." (Tr. 642, 645, 648.) On her April 3 visit, Plaintiff reported having "difficulty focusing," and "her thoughts were all over the place thinking about visiting her brother that weekend." (Tr. 647–48.)

At an April 9, 2013 visit with Dr. Sikes, Plaintiff "continue[d] to say she fe[lt] better and that she [was] more positive than she ha[d] been in the past." (Tr. 650.) She stated that she recently "really enjoyed herself" when she went to her brother's house, and they made plans to go camping together. (*Id.*) She also stated that she went out for her birthday with her daughter and got her hair and nails done. (*Id.*) Plaintiff noted reduced concentration and slower thought processes, as well as increased hot flashes, and she believed that she was experiencing perimenopause. (*Id.*) She further reported difficulty sleeping and depressed mood but was improving. (*Id.*)

On April 16, 2013, Plaintiff reported to Dr. Engdahl that she reached out to her mother, who offered to fly her to visit in Florida. (Tr. 653.) Plaintiff stated that this demonstration of support was out of character, so her expectations about what might happen when she saw her mother were realistic; Dr. Engdahl observed that Plaintiff was

"much less emotionally reactive." (*Id.*) Plaintiff also stated that reconnecting with her brother was very good for her. (*Id.*) On May 17, after the trip to Florida, Plaintiff reported that she and her mother got tattoos together, and she and Dr. Engdahl discussed the demonstration of feelings from Plaintiff's mother and Plaintiff's effective dealing with stressful interactions. (Tr. 655.) On May 23, Dr. Engdahl and Plaintiff discussed "acceptance" and changing her approach to experiencing, rather than stopping, difficult emotions. (Tr. 657.)

During a visit on June 6, 2013, Plaintiff discussed returning to work with Dr. Engdahl. (Tr. 659.) Dr. Engdahl noted Plaintiff was "somewhat apprehensive about this topic" because she was concerned about failure. (*Id.*) Dr. Engdahl recommended becoming involved with a volunteer organization in order to begin to move toward work. (*Id.*) Plaintiff stated that she was going to contact some hospitals "about available volunteer opportunities to challenge her thinking about her inability to be there on time and stay for a shift." (*Id.*) Dr. Engdahl noted that Plaintiff was going to be staying with her brother for the next two weeks. (*Id.*)

On June 20, 2013, Plaintiff reported increased mobility at home. (Tr. 662.) She was also more outgoing, taking buses around town and going for walks. (*Id.*) Dr. Engdahl noted that Plaintiff "continue[d] to face anxiety provoking experiences and thinking more head on than in the past," though one consequence was increased headaches. (*Id.*) On June 26, Plaintiff stated "today is not a good day" because she was up two pounds from the prior visit and her anxiety was worse, though she wondered if it was the result of a certain medication combination. (Tr. 664.) Still, Plaintiff believed that Remeron was the

right medication despite the weight gain, and her mother had bought her clothes, so she was not worried about how her clothes fit. (*Id.*) She also reported more contact with her family, taking the bus a few times, and applying for a volunteer position at St. Cloud hospital for four hours per week. (*Id.*) On June 27, Plaintiff described a recent flashback experience and panicking in public following exposure to a trigger of her trauma, and she was feeling bad about not having plans for July 4th. (Tr. 666–67.) She and Dr. Engdahl discussed that Plaintiff "survived her worst fear and went on with her day." (*Id.*) After discussing how she could be proactive, Plaintiff intended to call her brother about spending a few days with his family. (Tr. 667.)

Dr. Engdahl noted in his July 12, 2013 visit that Plaintiff was excited about a recommended shift in thinking regarding anxiety, and she intended to try it over the next two weeks. (Tr. 669.) She was also excited about babysitting at the lake home of her ex-husband. (*Id.*)

Plaintiff reported recent anxiety as a result of medication changes on August 1, 2013. (Tr. 672.) Dr. Engdahl recommended "techniques to enhance her skills and decrease her reliance on a fast acting type of medication mix." (*Id.*) On August 9, Plaintiff and Dr. Engdahl discussed "ongoing anxiety and use of medications to control anxiety and headaches." (Tr. 675.) Plaintiff said that migraines throw her off emotionally, and Dr. Engdahl encouraged her to continue previous efforts to "delay using medication to modify uncomfortable states" and discussed how to accomplish that. (*Id.*)

By August 22, 2013, Plaintiff's anxiety had improved; Plaintiff thought the gabapentin that she started in early August was helpful. (Tr. 677.) She said that the prior

week was "the best week she ha[d] had in probably a year;" she enjoyed being asked to help with directions for her ex-sister-in-law's wedding, and she was looking forward to attending another wedding with her brother's family. (*Id.*) Plaintiff also reported using her coping skills more effectively and therefore needing Ativan less. (*Id.*) She started acupuncture about six weeks prior, making her insomnia better and reducing her need for Lunesta. (*Id.*) Dr. Sikes discussed Plaintiff's previous over-utilization of Tramadol and Ativan and noted that she expected gabapentin might replace Ativan. (*Id.*) Plaintiff continued to report some decreased interest and depression but was having "markedly less difficulty with sleep, energy, and appetite." (*Id.*) On August 23, Plaintiff told Dr. Engdahl that she learned a friend of her son committed suicide. (Tr. 679.) She was saddened by the death and also her children's feeling that they could not approach her because they were concerned about how she would handle the news; she wanted to be able to provide comfort to her son. (Tr. 679.)

Plaintiff saw Dr. Engdahl on September 16, 2013 and reported that she was doing well, her mood was stable, and she was spending more time with her son. (Tr. 681.)

At a consultation with Dr. Sikes on October 28, 2013, Plaintiff reported that overall she was "feeling pretty good" and "coping a lot better." (Tr. 683.) Still, she was also feeling bad and having difficulty some days, including "some passive suicidal thoughts." (*Id.*) Plaintiff enjoyed going to a wedding with her family the week before, but on the way home, she experienced a sudden decrease in mood and felt empty and depressed. (*Id.*) Dr. Sikes observed that it might relate to seeing family members for the first time since the death of her father. (*Id.*)

On October 31, 2013, Plaintiff reported "doing quite well" to Dr. Engdahl, recently applying to be a volunteer women's advocate. (Tr. 686.) With respect to Plaintiff's disability application, Dr. Engdahl stated that he "did not believe that she is disabled from a mental health perspective," and if she was awarded disability, it "may serve to reduce forward movement, reduce motivation for change, and potentially result in decreased quality of life." (*Id.*) Plaintiff agreed with Dr. Engdahl's assessment that migraine headaches were her primary issue and significantly exacerbated her depressive symptoms and other illnesses. (*Id.*) Plaintiff reported that any depressive or anxious symptom was fleeting and within the normal human experience. (*Id.*)

### iii.    Low Back Pain

Plaintiff underwent back surgery in April 2009 with a right L2-L3 lumbar discectomy. (Tr. 555.) The record reflects no back issues until more than three years later on May 23, 2012, just before her alleged disability onset date. On that date, Plaintiff called CentraCare complaining of back pain with pain in her left hip to the knee. (Tr. 393.) Three days later, Plaintiff saw Dr. Maureen Kemper at CentraCare with "a one day history of severe low back pain radiating into her left leg." (Tr. 390.) Dr. Kemper noted Plaintiff's back surgery but was unsure what had caused the current problem. (*Id.*) Dr. Kemper also noted that Plaintiff's range of motion of the lumbar spine was decreased due to the pain, and she was leaning over the table during the exam. (Tr. 390, 392.) Dr. Kemper prescribed pain medication and scheduled physical therapy. (Tr. 390, 392.) On June 5, 2012, Plaintiff left a message at CentraCare stating that she thought her work was causing her pain to get worse, and she requested a note to excuse her from work until she

got physical therapy and felt better. (Tr. 388.) Dr. Neuman responded that she "need[ed] to know specifically what at work hurts [Plaintiff's] back" before she could write a letter with restrictions, and she could not write Plaintiff completely out of work. (*Id.*) Dr. Neuman wrote a letter for Plaintiff with restrictions the next day, but recommended that Plaintiff continue to be active. (*Id.*) At a physical therapy session on June 7, 2012, Plaintiff reported a pain rating of two out of ten. (Tr. 488.) Plaintiff responded well to the manual therapy intervention. (Tr. 489.)

After her alleged onset date, Plaintiff exhibited spasm but normal range of motion and no tenderness in her back at a physical exam with Dr. Neuman on August 23, 2012. (Tr. 444.) On August 30, Plaintiff was discharged from the physical therapy program because she did not return after her June 7 visit. (Tr. 491.)

On May 13, 2013, Plaintiff saw a nurse practitioner at CentraCare for back pain resulting from a May 4 motor vehicle accident. (Tr. 554.) Her pain was worse from long trips sitting in the car to the airport in Florida, on the plane, and in the car from the Minneapolis airport to St. Cloud. (Tr. 554–55.) She rated her pain at 7 to 8 when moving and 4 to 5 at rest; she used medication with minimal improvement; and she denied numbness, tingling, or weakness. (Tr. 555.) The nurse noted that Plaintiff was not in acute distress, and the nurse did not note any unusual results from the examination, other than that Plaintiff moved very slowly. (*Id.*) The nurse prescribed pain medication and requested x-rays. (*Id.*) The x-rays returned the same day with findings of "normal alignment and curvature of the lumbar spine; [n]o evidence for fracture or subluxation;

[m]ild degenerative changes . . . at L1-L2 and L2-L3; [s]acroiliac joints are maintained." (Tr. 588.)

Plaintiff saw the same nurse practitioner on November 29, 2013, complaining of back pain. (Tr. 732.) She said that her back pain began on November 24, when she bent over washing her hair, and became quite severe the day before. (*Id.*) She denied pain down her legs and reported an area of numbness, tingling, and weakness on the left lateral outer thigh. (*Id.*) She rated her pain 3 out of 10 at best, 9 out of 10 at worst. (*Id.*) Plaintiff also reported that gabapentin, ibuprofen, and heat seemed to help the pain. (Tr. 733.) The nurse noted that Plaintiff's moves were "very guarded," her reflexes were "intact at 2/2," her gait was "steady and guarded," her straight leg raises were "positive bilaterally at approximately 45 degrees," and there was "some reproducible tenderness with palpation over the area." (*Id.*) The nurse prescribed pain medication and requested an MRI of the lumbar spine. (*Id.*) The MRI showed mild disc bulge with degenerative disc disease, "slightly progressed compared to the prior examination," and mild facet arthropathy. (Tr. 741.) Physical therapy was recommended. (*Id.*)

### iv.   Rheumatoid Arthritis

Plaintiff's rheumatoid arthritis was treated before her alleged onset date by Dr. Romanowsky and Dr. Neuman, and after by Dr. Nee and Dr. Christopher Widstrom.

On July 29, 2011, Dr. Romanowsky noted Plaintiff's history of rheumatoid arthritis. (Tr. 360.) On April 4, 2012, Plaintiff reported on the phone that the arthritis in her hands was bothering her, and her joints were swollen with stiffness and tenderness; she inquired about getting sed rate and CRP tests. (Tr. 407–08.) Dr. Neuman ordered the

tests and recommended evaluation in rheumatology if the sed rate was significantly

elevated. (Tr. 407.) Plaintiff was referred to rheumatology, but on May 14, Plaintiff

called to say that rheumatology was scheduling out six to eight months, so Dr. Neuman

recommended that Plaintiff's labs be rechecked in three months, and if they were

negative, Plaintiff could choose whether to consult rheumatology. (Tr. 396.)

On September 25, 2012, Dr. Nee noted Plaintiff's history and that she "was

temporarily treated with methotrexate but then appeared to have complete resolution of

her symptoms and normal serological testing." (Tr. 509.) Dr. Nee also noted that Plaintiff

was referred to rheumatology, but the referral was closed because Plaintiff did not return

the call or respond to the letter; Plaintiff stated that she did not recall receiving a phone

call or letter. (*Id.*) Plaintiff reported some discomfort with her hands, and Dr. Nee

observed that the symptoms "might be more degenerative in origin, not related to

rheumatoid arthritis." (*Id.*)

Plaintiff reported to Dr. Nee on January 10, 2013 that "her arthritis symptoms

generally [were] stable." (Tr. 535.) On February 4, 2013, Plaintiff presented to Dr. Nee

complaining about discomfort in joints in both hands. (Tr. 541.) She reported that she

was having "pretty intolerable thumb discomfort" and finding activities like getting

toothpaste onto the brush, clipping nails, and doing yoga difficult, and she felt "she [was]

dropping things because of weakness." (*Id.*) One day, she could not get out of the

bathroom because of discomfort turning the doorknob. (*Id.*) Plaintiff's recent laboratory

studies demonstrated normal CCP antibody, normal CRP, and negative rheumatoid

factor. (*Id.*) Dr. Nee examined Plaintiff's thumb and noted that there was no "evidence of

effusion at the PIP joints," and there was normal range of motion, but "palpation of the medial aspect of that joint bilaterally [was] exquisitely tender." (Tr. 542.) Dr. Nee recommended injection therapy and was willing to consider splint therapy if needed after the injections. (*Id.*)

Plaintiff was examined by Dr. Christopher Widstrom at St. Cloud Orthopedic Associates on February 20, 2013. (Tr. 498.) Dr. Widstrom recommended wearing removable splints with activities and taking glucosamine chondroitin for two months, and if there was little improvement, possibly a cortisone injection. (*Id.*) On March 11, Plaintiff reported developing a rash from off-the-shelf splints and needing custom splints. (Tr. 500.) Plaintiff reported no pain at that time but said she had pain with movement, sometimes a shooting pain rating ten out of ten. (*Id.*) Custom splits were ordered with no plan for further services. (*Id.*)

## B. Testimony at Administrative Hearing

### i. Plaintiff's Testimony

At the January 9, 2014 administrative hearing, Plaintiff was examined by her non-attorney representative and by the ALJ. (Tr. 36, 133.) She testified to the following.

Plaintiff was fifty-one years old and completed her education through one year of technical college, earning an associate's degree. (Tr. 40.) She worked at CentraCare from 1984 to 2004, first as an executive assistant, then, for the last three years, in medical transcription, which she did at home. (Tr. 47.) She then worked at Health South in the business office reception; she was terminated for excessive absences. (Tr. 47–48.) Plaintiff then worked part time at a school district, and at J&J Homes from 2011 to 2012.

26

(Tr. 48.) Her last job, in June 2012, was as a full-time human resources assistant and receptionist. (Tr. 40–41, 48, 51.) She was terminated for multiple absences after exhausting her available medical leave time starting with a leave in December 2011. (Tr. 41.) She was missing twelve days of work per month, on average, because of migraines and migraine symptoms. (*Id.*) Plaintiff applied to be a hospital volunteer, but she decided not to pursue that because she did not know if she would be dependable. (Tr. 51–52.)

Plaintiff suffered from migraines her entire life; they interfered with her ability to work beginning in at least 2004. (Tr. 41, 48.) Plaintiff first stated that the migraines began to get worse and more frequent beginning "about six years ago," but later said that they became more frequent in 2005. (Tr. 41, 49.) She was currently having migraines approximately once or twice a week, or about six times per month. (Tr. 41.) The migraines varied in duration, but most required medication beyond a first dose, and some lingered for days. (Tr. 42.) Plaintiff experienced symptoms of tunnel vision, spots in her eyes, pain, and sensitivity to smell, light, and sound. (*Id.*) There was no "rhyme or reason" to what caused the migraines. (*Id.*) Plaintiff was physically sick when she had a migraine, vomiting and experiencing intense pain. (*Id.*) She was unable to do anything when having a migraine and would go to a dark room. (Tr. 42–43.)

Plaintiff used emergency room visits as her last resort to relieve her migraines, usually after waiting a day or two; these visits occurred from one to five times per month. (Tr. 43, 51.) She could not remember going a month without a migraine. (Tr. 44.) Although she was currently getting more aggressive treatment for migraines than when

she was working, the emergency room visits also occurred when she was working. (Tr. 49.)

Plaintiff was seeing Dr. Romanowsky and Dr. Nee for migraine treatment. (Tr. 49.) Over the years, Plaintiff tried many treatments for migraines: testing, such as MRIs, CT scans, and a bubble echocardiogram; medications; acupuncture; chiropractor visits; and Botox. (Tr. 44.) She was getting Botox treatments for the past two-and-a-half years and currently received the injections every three months, which helped with the severity of her migraines, but not the frequency. (Tr. 44, 50, 51.) Plaintiff was currently taking mathsalt and tramadol, and she tried Imitrex, beta blockers, and ace inhibitors. (Tr. 50.) The various medications either did not work or rarely helped. (Tr. 44, 50.)

Plaintiff received prescription narcotics from Dr. Nee and when she was treated in the emergency room. (Tr. 50.) Plaintiff discussed the frequency of her emergency room visits and the narcotics she was getting there with at least one of her doctors, but her doctors did not change her treatment. (Tr. 51.)

Plaintiff also suffered from depression, a panic disorder, and PTSD; she experienced symptoms of getting tearful and not wanting to go out of her home alone. (Tr. 44–45.) She was currently seeing a psychiatrist who prescribed medication every two months, and a psychotherapist every month. (Tr. 45.) Plaintiff participated in a partial hospitalization program for thirty-one days from October to November 2012. (*Id.*) She decided to go to the program because she couldn't stop crying, had suicidal thoughts and panic attacks. (*Id.*) She continued to have panic attacks about once a week. (Tr. 45–46.)

Arthritis in Plaintiff's hands made it difficult for Plaintiff to grasp or carry things; typing was very hard. (*Id.*) She wore splints on both hands at the hearing, and she wore those most every day, especially when the weather was cold or rainy. (*Id.*) The left hand was worse than the right; a hand surgeon recommended total joint replacement in Plaintiff's left hand. (Tr. 47.) Plaintiff underwent physical therapy, but was told there was not much the therapists could do for her. (Tr. 52.)

### ii.    Vocational Expert ("VE") Testimony

At the administrative hearing, the ALJ asked the vocational expert, Dr. Mitchell Norman, to assume a hypothetical individual of Plaintiff's age, education, and past work experience with a residual functional capacity for light work but limited to simple, routine, and repetitive tasks with no work at unprotected heights or around any dangerous or moving machinery and no climbing of ladders, ropes, or scaffolds. (Tr. 53–54.) Dr. Norman testified that this person could not return to Plaintiff's previous work, but could work as a mail clerk, bench assembler, or laundry sorter. (Tr. 54.) He stated that these jobs all had a Specific Vocational Preparation (SVP) of two. (*Id.*) He additionally stated that there are approximately 4,800 mail clerks in Minnesota and 138,000 nationally; 5,500 bench assemblers in Minnesota and 280,000 nationally; and 8,160 laundry sorters in Minnesota and 454,000 nationally. (*Id.*)

The ALJ then asked Dr. Norman to add to the hypothetical that the individual could not tolerate environmental conditions of concentrated exposure to loud noise or strong fumes or odors that trigger headaches. (*Id.*) Dr. Norman responded that he would eliminate the bench assembler and laundry sorter jobs, but the mail clerk job would still

be appropriate. (Tr. 54–55.) Dr. Norman suggested office helper (SVP of 2; approximately 1,250 in Minnesota and 85,620 nationally) and assembler of plastic hospital products (SVP of 2; approximately 8,700 in Minnesota and 210,000 nationally) as substitute positions. (Tr. 55.) The ALJ then added to the hypothetical that the individual could not tolerate excessively bright lights. (*Id.*) Dr. Norman responded that most of the jobs he described would be performed in a "typical office environment," so if the lights were considered to be excessively bright, those jobs would be eliminated, but, if not, those jobs would still be appropriate. (*Id.*) Dr. Norman did not consider office environments to be excessively bright. (Tr. 55–56.)

Dr. Norman was questioned by Plaintiff's non-attorney representative and testified that if an individual was likely to miss three days of work per month due to frequent, chronic migraines and migraine symptoms, there would be no work for that individual. (Tr. 56.)

## III.    ALJ's Findings & Decision

On January 27, 2014, the ALJ found Plaintiff not disabled from June 20, 2012, through the date of the decision. (Tr. 30.) To arrive at his decision, the ALJ followed the procedure for determining whether a person is disabled outlined by 20 C.F.R. § 404.1520(a)(4).

At step one, the claimant must show that she is not engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). The ALJ found that Plaintiff did not engage in substantial gainful activity since June 20, 2012, the alleged onset date. (Tr. 15.)

Since Plaintiff met her burden at step one, the ALJ's evaluation continued to step two, where the claimant must establish a severe medically determinable impairment. 20 C.F.R. § 404.1520(a)(4)(ii). The ALJ determined that Plaintiff's migraines, anxiety disorder, depressive disorder, and degenerative disc disease are severe impairments. (Tr. 15.) The ALJ found that Plaintiff's other impairments, including rheumatoid arthritis, are non-severe. (Tr. 16.) The ALJ noted that Plaintiff's sacroiliac dysfunction is "connected to her degenerative disc disease." (*Id.*)

The ALJ continued to step three, finding that Plaintiff's impairments do not meet or medically equal the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*) *See* 20 C.F.R. § 404.1520(a)(4)(iii). The ALJ considered Listings 1.00 (musculoskeletal system) for Plaintiff's degenerative disc disease and 11.00 (neurological) for her migraines and found that her impairments, taken singly or in combination, did not meet any of those listings. (*Id.*) Having considered opinions by state agency medical consultants at the initial and reconsideration levels of the administrative review process, the ALJ noted that no treating or examining physician mentioned findings equivalent in severity to the criteria of any listed impairment. (*Id.*)

The ALJ also found that Plaintiff's mental impairments do not meet or medically equal the severity of the criteria of Listings 12.04 (affective disorders) or 12.06 (anxiety related disorders). (Tr. 16.) The ALJ found that Plaintiff had "mild limitations in her activities of daily living and social functioning and moderate limitations in her ability to maintain concentration, persistence, and pace," and that she had not experienced episodes of decompensation of extended duration; thus, the "paragraph B" criteria were not

satisfied. (*Id.*) The ALJ also found no evidence of repeated episodes of decompensation in the record, no evidence of such marginal adjustment that even a minimal increase in mental demands or change in Plaintiff's environment could cause her to decompensate, no evidence of an inability to function outside a specialized faculty, and no evidence of an inability to function outside her home. (*Id.*) He thus found that the "paragraph C" criteria were likewise not satisfied. (*Id.*) Consequently, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met the severity standard. (*Id.*)

Having established the severity of Plaintiff's ailments based on the paragraph B and C criteria, the ALJ progressed to step four and evaluated Plaintiff's RFC, considering the degree of limitation he found in the paragraph B mental function analysis. (Tr. 17.) *See* 20 C.F.R. § 404.1520(a)(iv). The ALJ found that Plaintiff has the RFC to perform light work, except that she would be limited to simple, routine, and repetitive tasks with no work at unprotected heights or around dangerous or moving machinery and no climbing of ladders, ropes, or scaffolds. (Tr. 17.) *See* 20 C.F.R. §§ 404.1567(b), 416.967(b).

Specifically, the ALJ found that the effects of Plaintiff's alleged physical impairments left her with the ability to perform light exertional work. (Tr. 26.) Plaintiff's migraines do not prevent her from engaging in activities of daily living, such as caring for her household, taking care of her own hygiene, providing for her own transportation, and managing her own medications, medical care, and finances. (Tr. 26.)

Regarding her mental impairments, the ALJ noted that Plaintiff's ability to perform activities of daily living, as noted in the effects of her physical impairments, suggested that she had mild difficulties in daily activities. (Tr. 27.) The ALJ also observed that Plaintiff reported problems in focus and attention and concerns about reliability when working; the ALJ concluded that Plaintiff exhibited moderate difficulties in concentration, persistence, and pace. (*Id.*) Plaintiff complained of isolating herself socially, but also reported various social outings and overnight trips with family and friends; the ALJ concluded that Plaintiff exhibited moderate difficulties in social functioning. (*Id.*)

Further, the ALJ found that while Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms . . ., [Plaintiff's] statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent that they are inconsistent with [his RFC] assessment." (Tr. 27–28.) The ALJ pointed to Plaintiff's testimony that she suffered from migraines and depression for many years, that the migraines worsened in 2004, and that she went on FMLA leave. (Tr. 28.) The ALJ observed that this history did not match up with the dates on which she was able or not able to work. (*Id.*) The ALJ also explained that the increased depression, anxiety, and migraines in late 2011 resulted from the break-up of Plaintiff's longtime relationship and that medication and therapy helped control these conditions. (*Id.*) The ALJ cited various times that Plaintiff either did not seek treatment or sought treatment inappropriately in light of the advice from her physicians. (*Id.*) Lastly, the ALJ explained that the evidence indicated improvement in her migraines, depression, anxiety, and back

33

pain. (*Id.*) The ALJ concluded that "overall, [Plaintiff's] impairments do not appear to prevent her from engaging in work activity," and "the inconsistencies between the medical record and [Plaintiff's] allegations and testimony severely undermine [Plaintiff's] credibility." (*Id.*)

The ALJ also credited several medical opinions. (Tr. 28–29.) First, the ALJ gave weight to the opinions of the State agency medical and psychological consultants, who opined that Plaintiff's "mental impairments caused moderate limitations in her social functioning and concentration, persistence, and pace," and that she "could perform light exertional activity with postural limitations and environmental limitations." (Tr. 28.) Second, the ALJ noted that Plaintiff's therapist, Dr. Engdahl, "did not offer a specific report regarding [Plaintiff's] functioning," but in October 2013 the therapist "expressed to [Plaintiff] that he 'did not believe that she is disabled from a mental health perspective.'" (Tr. 28, 686.) The ALJ gave weight to this statement because it was consistent with other evidence that Plaintiff's mental health symptoms improved with treatment. (Tr. 28–29.) The ALJ accordingly found, based on "the weight of the evidence," that Plaintiff's

> degenerative disc disease leaves her capable of performing light exertional work but due to residual symptoms from migraines, anxiety, and depression she is best suited . . . to simple, routine, repetitive tasks with no work at unprotected heights or around dangerous or moving machinery and no climbing of ladders, ropes, or scaffolds.

(Tr. 29.)

At step four, the ALJ found Plaintiff unable to perform her past relevant work because it was classified as semi-skilled, and Plaintiff's RFC limited her to unskilled work. (Tr. 29.) *See* 20 C.F.R. § 404.1520(a)(4)(iv).

Since Plaintiff was unable to perform her past relevant work, the ALJ proceeded to step five. At step five, the burden shifts to the ALJ to prove that there are alternative jobs the claimant can perform, and that there are a sufficient number of those jobs available in the national economy. *See* 20 C.F.R. § 404.1520(a)(4)(v). The ALJ found that Plaintiff can perform jobs that exist in significant numbers in the national economy. (Tr. 29.) In reaching this conclusion, the ALJ relied on the vocational expert's testimony that a hypothetical individual with Plaintiff's age, education, work experience, and RFC would be able to perform the requirements of representative occupations such as mail clerk, bench assembler, and laundry sorter. (Tr. 30.) As the vocational expert testified, these jobs exist in significant numbers in the national economy. (*Id.*) Accordingly, the ALJ found that Plaintiff was not disabled during the alleged period of disability. (*Id.*)

## DISCUSSION

### I.   Standard of Review

Congress established the standards by which social security disability insurance benefits may be awarded. A claimant is disabled if she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's impairments must be "of such severity that she is not only

unable to do her previous work but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

The claimant bears the burden of proving disability. *Whitman v. Colvin*, 762 F.3d 701, 705 (8th Cir. 2014). Once the claimant demonstrates that she cannot perform past work due to a disability, "the burden of proof shifts to the Commissioner to prove, first that the claimant retains the [RFC] to do other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to do." *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000) (citations omitted).

This Court has the authority to review the Commissioner's final decision denying disability benefits to Plaintiff. 42 U.S.C. § 405(g); *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). If the Commissioner's decision is supported by substantial evidence in the record as a whole, then the decision will be upheld. 42 U.S.C. § 405(g); *Kluesner*, 607 F.3d at 536 (citations omitted). "[T]he substantiality of the evidence must take into account whatever fairly detracts from its weight, and the notable distinction between 'substantial evidence' and 'substantial evidence on the record as a whole,' must be observed." *Bauer v. Soc. Sec. Admin.*, 734 F. Supp. 2d 773, 799 (D. Minn. 2010) (citations omitted). This test requires "more than a mere search of the record for evidence supporting the Secretary's findings." *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987). If, after review, the record as a whole supports the Commissioner's findings, the Commissioner's decision must be upheld, even if the record also supports the opposite conclusion. *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008).

## II.    Analysis of ALJ Decision

### A.    Equivalence at Step Three

Plaintiff first argues that the ALJ erred in evaluating the Listings at step three.

Importantly, Plaintiff concedes that her migraines and her depression, standing alone, do

not meet any of the Listings. (Pl.'s Mem. at 9.) Even so, Plaintiff argues that the

combination of her impairments are medically equivalent to the listing for nonconvulsive

epilepsy. (*Id.* at 9–11.)[4]

To be medically equivalent, a claimant's impairment or impairments "must be 'at

least equal in severity and duration to the criteria of any listed impairment.'" *Myers v.*

*Colvin*, 721 F.3d 521, 524–25 (8th Cir. 2013) (quoting 20 CFR §§ 404.1526(a),

416.926(a)). The ALJ, as noted above, discussed all of Plaintiff's severe impairments at

step three, in addition to her activities of daily living. (Tr. 16–17.)  In such circumstances,

the ALJ's finding on equivalence is properly articulated and supported by substantial

evidence in the record. *Browning v. Sullivan*, 958 F.2d 817, 821 (8th Cir. 1992). "To

require a more elaborate articulation of the ALJ's thought processes would not be

reasonable." *Id.*; *see also Martise v. Astrue*, 641 F.3d 909, 924 (8th Cir. 2011) ("Based on

the ALJ's synopsis of Martise's medical records and discussion of each of Martise's

_____

[4]    At the time of the ALJ's decision and then when the parties' summary judgment
briefs were filed, 11.03 was the listing for nonconvulsive epilepsy. In September 2016,
the SSA combined the listings for convulsive and nonconvulsive epilepsy into listing
11.02. *See* Revised Medical Criteria for Evaluating Neurological Disorders, 81 FR 43048
(S.S.A. July 1, 2016), 2016 WL 3619263. This change does not alter the analysis.

alleged impairments, we conclude that the ALJ properly considered the combined effects of Martise's impairments.").

Plaintiff also argues that the ALJ failed to consult with a medical expert on equivalence. "[L]ongstanding policy requires that the judgment of a physician . . . designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge . . . must be received into the record as expert opinion evidence and given appropriate weight." SSR 96–6p (S.S.A.), 1996 WL 374180. The ALJ did, in fact, obtain opinions from State agency medical consultants on the issue of equivalence. (Tr. 16, 90, 92, 124, 125.) "The signature of a State agency medical or psychological consultant on [a Disability Determination and Transmittal Form) . . . ensures that consideration by a physician (or psychologist) designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review." SSR 96-6p.

Beyond these opinions, Plaintiff seems to argue that the ALJ was required to obtain an *updated* medical opinion on equivalence. (Pl.'s Mem. at 12–14.) However, an updated opinion is only required when (1) the symptoms, signs, and laboratory findings reported in the case record suggest to the ALJ that a judgment of equivalence may be reasonable; or (2) when additional medical evidence is received that in the opinion of the ALJ may change the State agency medical or psychological consultant's finding that the impairment or impairments are not equivalent in severity to any impairment in the Listing of Impairments. SSR 96-6p. On the first point, the evidence did not suggest that a finding of equivalence would be reasonable. Instead, the ALJ found the evidence "insufficient to

establish that the claimant's impairments, taken singly or in combination, meet any of the above listings." (Tr. 16.) On the second point, the ALJ did not receive any new evidence that undermined the state agency opinions, the last of which were issued in February 2013. (Tr. 124, 125.) To the contrary, evidence pertaining to Plaintiff's condition and treatment after those opinions were issued does not undermine those opinions. In May 2013, for example, Plaintiff reported in an emergency room visit that her headaches improved when she took Maxalt and Vicodin. (Tr. 23, 692.) Plaintiff was treated with medication, her symptoms were relieved, and she was discharged. (Tr. 23, 693.) This evidence, suggesting that Plaintiff's symptoms can be controlled with medication, supports rather than undermines the state agency opinions on equivalence. *See Bernard v. Colvin*, 774 F.3d 482, 488 (8th Cir. 2014) ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling."). Therefore, the ALJ was not required to obtain an updated medical opinion on equivalence, and his step three conclusion is supported by substantial evidence.

Finally, while the ALJ has a duty to develop the record fully and fairly, reversal and remand for further proceedings is required only if Plaintiff was prejudiced or treated unfairly. *Onstad v. Shalala*, 999 F.2d 1232, 1234 (8th Cir. 1993). Plaintiff was represented by a non-attorney disability specialist, and she offers no evidence to suggest that an updated opinion on equivalence would have been different than those that were already in the record. Therefore, Plaintiff failed to meet her burden of demonstrating that a remand is warranted. *Lacroix v. Barnhart*, 465 F.3d 881, 886 (8th Cir. 2006) (Plaintiff

"presented no evidence suggesting" a different outcome and therefore "failed to establish the prejudice necessary for a reversal due to a failure to develop the record").

**B.    Residual Functional Capacity**

Plaintiff argues that the ALJ's RFC finding was incorrect because he did not adopt Dr. Engdahl's GAF findings in the 50–55 range, which indicate moderate symptoms or difficulty in social or occupational functioning. (Pl.'s Mem. 9, 14–15.) As a result, the ALJ's hypothetical question to the vocational expert did not incorporate all of Plaintiff's limitations, resulting in a decision not supported by substantial evidence. (*Id.* at 16–17.) The Commissioner counters that the Plaintiff's RFC finding was supported by substantial evidence, and accordingly, the hypothetical question was proper. (Doc. No. 21, Def.'s Mem. 13–19.)

 RFC is what the claimant "can still do physically even with her impairments." *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010) (quoting *Reed v. Sullivan*, 933 F.2d 812, 815–16 (8th Cir. 1993)). "It is the ALJ's responsibility to determine claimant's RFC based on all the relevant evidence, including medical records, observations of treating physicians and others, and claimant's own description of her limitations." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007). A disability claimant "has the burden to establish her RFC." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004).

Plaintiff argues that Dr. Engdahl's opinion is entitled to controlling weight under the treating physician rule. *See Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005) ("[A] treating physician's opinion is given 'controlling weight' if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent

with the other substantial evidence."). GAF scores, however, "may have little or no

bearing on the subject's social and occupational functioning," and there is no "statutory,

regulatory, or other authority requiring the ALJ to put stock in a [GAF] score in the first

place." *Jones*, 619 F.3d at 973 (quoting *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x

496, 511 (6th Cir. 2006)). Plaintiff's GAF scores, moreover, were not all in the lower

50's. For example, on October 10, 2012, Plaintiff was given a GAF score of 60 "to reflect

her progress." (Tr. 20, 591.) The following month, Plaintiff received a GAF score of 65

upon her discharge from partial hospitalization, indicating only mild symptoms. (Tr. 21,

616.) Plaintiff cannot pick and choose favorable GAF scores under the auspices of the

treating physician rule.[5]

---

[5]      Although the ALJ did not recite every GAF score in the record, he noted five
scores, ranging from 45 to 65, given from April 2012 to October 2013. (Tr. 19, 20, 21,
25.) Plaintiff's chronological GAF scores were as follows: 50 (Tr. 439, 435, 434, 432,
430 (respectively, Apr. 23, 2012; May 11, 2012; June 7, 2012; June 28, 2012; July 12,
2012)); 60 (Tr. 590 (Oct. 10, 2012)); 45 (Tr. 614, 615 (Oct. 16, 2012)); 65 (Tr. 614, 616
(Nov. 12, 2012)); 50 (Tr. 658, 660, 663, 667, 670 (respectively, May 23, 2013; June 6,
2013; June 20, 2013; June 27, 2013; July 12, 2013)); 55 (Tr. 672 (Aug. 1, 2013)); 50
(Tr. 676 (Aug. 9, 2013)); 55 (Tr. 680, 682 (respectively, Aug. 23, 2013; Sept. 16, 2013));
and 63 (Tr. 687 (Oct. 31, 2013)). Although it is true that eleven of Plaintiff's eighteen
scores were 50 and one was 45, the ALJ is not required to give those scores more weight
than the other scores; the last several scores were higher, and the ALJ specifically
observed that "[m]edical records from 2013 reinforce the idea that [Plaintiff's
impairments] had improved significantly." (Tr. 28.) *Compare Halverson v. Astrue*, 600
F.3d 922, 931 (8th Cir. 2010) (concluding that, despite a GAF score of 40, the history of
GAF scores between 52 and 60, taken as a whole, indicated claimant had moderate
symptoms or moderate difficulty in social or occupational functioning), *with Pate–Fires
v. Astrue*, 564 F.3d 935, 944 (8th Cir. 2009) (noting that claimant's GAF scores were
above 50 only four out of twenty-one times in a six-year period and concluding that the
history of the GAF scores, taken as a whole, demonstrated the claimant had serious
symptoms or serious impairment in social, occupational, or school functioning).

Ultimately, an ALJ "may afford greater weight to medical evidence and testimony than to GAF scores when the evidence requires it." *Jones* at 974. This is what happened in the instant case. The ALJ used not only Plaintiff's GAF scores, but the full record to assess Plaintiff's functioning. The ALJ reviewed, at length, Plaintiff's medical history and treatments, including appointments with doctors, emergency room visits, a partial hospitalization program, and medications, from January 2011 to December 2013. (Tr. 17–26.) He also considered her testimony at the hearing. (Tr. 26.) The ALJ concluded that Plaintiff's migraines did not prevent her from "engaging in activities of daily living," specifically noting that the evidence showed that she had been living alone and taking care of her own personal and medical needs. (*Id.*) The ALJ further concluded that Plaintiff's "statements concerning the intensity, persistence, and limiting effects of [her] symptoms [were] not credible" and her "impairments [did] not appear to prevent her from engaging in work activity." (Tr. 27–28.) The ALJ specifically pointed to evidence showing that Plaintiff's migraines did not prevent her from working, even after they worsened, and that the increase in depression, anxiety, and migraine symptoms in 2011 and 2012 were because of the end of Plaintiff's relationship with her boyfriend. (Tr. 28.) The ALJ detailed various inconsistencies between the medical record and Plaintiff's allegations and testimony. (*Id.* (describing Plaintiff's failure to seek treatment from her neurologist for a year, despite alleging that she was disabled at that time; Plaintiff's use of medications after being advised against using them; Plaintiff's inconsistent statements to different physicians about starting a recommended medication; and Plaintiff's increased social and physical activity, which showed improvement in symptoms in

2013).) Further, contrary to Plaintiff's assertion that the opinion of her treating physician was discounted, the ALJ specifically gave weight to Dr. Engdahl's statement that he "did not believe that she is disabled from a mental health perspective." (Tr. 29 (citing Tr. 686.).)

In determining Plaintiff's RFC, the ALJ additionally took Plaintiff's migraines into account by adopting state agency consultants' opinions that Plaintiff should avoid concentrated exposure to noise, fumes or odors, and hazards such as machinery or lights, in order to avoid headache triggers. (*Compare* Tr. 28, *with* Tr. 82–83, 102.)

The ALJ's decision not to rely on the GAF scores in the 50–55 range is therefore supported by substantial evidence. *See Jones* at 974; *Juszczyk v. Astrue*, 542 F.3d 626, 632–33 (8th Cir. 2008) (holding that the ALJ's decision to discount GAF scores in light of contrary medical evidence was supported by substantial evidence); *Hudson ex rel. Jones v. Barnhart*, 345 F.3d 661, 666–67 (8th Cir. 2003) (holding that the ALJ's conclusion that GAF scores assigned by treating providers did not reflect the claimant's actual functional capacity was proper). After considering all of the evidence, including the medical evidence in the record, the notes and opinions of treating and non-treating medical professionals, and Plaintiff's own testimony, this Court concludes that the ALJ considered all of the relevant evidence and properly based his RFC assessment on that evidence. The ALJ's conclusion that Plaintiff has the RFC to perform light work "limited to simple, routine, repetitive tasks with no work at unprotected heights or around dangerous or moving machinery and no climbing of ladders, ropes, or scaffolds" is supported by substantial evidence in the record as a whole.

Since the ALJ's RFC finding is "supported by substantial evidence[,] [t]he

hypothetical question was therefore proper, and the VE's answer constituted substantial

evidence supporting the Commissioner's denial of benefits." *Lacroix v. Barnhart*, 465

F.3d 881, 889 (8th Cir. 2006). Accordingly, this Court recommends affirming the ALJ's

decision.

**RECOMMENDATION**

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT**

**IS HEREBY RECOMMENDED** that:

1. Plaintiff Kellee Rae Cogger's motion for summary judgment (Doc. No. 15) be

   **DENIED**;

2. Defendant's motion for summary judgment (Doc. No. 20) be **GRANTED**; and

3. This action be **DISMISSED WITH PREJUDICE AND ON THE MERITS**.


Dated: January 10, 2017


*s/ Becky R. Thorson*
BECKY R. THORSON
United States Magistrate Judge

**NOTICE**

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b), a party may file and serve specific written objections to this Report and Recommendation by **January 24, 2017**. A party may respond to those objections within **fourteen days** after service thereof. All objections and responses must comply with the word or line limits set forth in D. Minn. LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.